## No. 9820.

### SUCCESSION OF KATE TOWNSEND.

### THE STATE OF LOUISIANA vs. TROISVILLE E. SYKES.—MRS. ELLEN TULLY ET AL., INTERVENORS.

The familiar rule of jurisprudence, which authorizes, on cross-examination, the leading questions by one of the parties to the witnesses of his adversary, is not affected or modified in a case where third parties have intervened, who oppose both the plaintiff and the defendant, and where, in some features of the controversy, the plaintiff and the defendant have a point of interest in common and adverse to the intervenors. Under an issue joined between them plaintiff and defendant have the undisputed reciprocal right to cross-examine their opponents witnesses. A motion to strike out the testimony of a witness, on the ground that by his absence or fault the witness-deprived the opposite party of the opportunity to complete his cross-examination, falls within the scope of the legal discretion vested by law in trial judges, whose rulings on such points will not be disturbed on appeal unless glaringly erroneous and unjustly arbitrary. Succession of Rieger, 37 Ann. 104.

The State claimed the succession of a person who had died unmarried, leaving no known ascendants or descendants, or collateral relations, adversely to a universal legatee in possession of the estate, on the ground of the alleged incapacity and unworthiness of the legatee, whereupon an intervention was filed by third persons claiming the succession as heirs at law of the deceased; who contended that under the issues thus involved, the burden of evidence was on the State to prove that the deceased had left no heirs possibly entitled to the succession, in default of which proof the State had no interest to resist the claim of the intervenors.

Held, by the court, that the burden of evidence was on intervenors who sought to recover as heirs to prove their heirship with legal certainty, in default of which they have no standing in court to regulate the disposition of the succession property. In an alleged vacant succession the State has an interest to defeat the pretensions of parties claiming to be heirs of the deceased. The mode of proving that a person known at a certain time and place as A, was the identical person subsequently known at another place under the name of B, by showing resemblance between A and pictures taken of B, is very unreliable and absolutely unsatisfactory.

Extra judicial statements of deceased persons have always been ranked as the weakest evidence, and when reported to have been made to single witnesses, in the presence of no one else, generally disregarded.

The State as a sovereign, owes no costs in litigation before her own courts, even when cast in a civil suit. State vs. Richard Taylor, 33 Ann. 1272; State vs. Miles Taylor, 34 Ann. 978.

Succession of Kate Townsend.

A PPEAL from the Civil District Court for the Parish of Orleans.
Houston, J.

*M. J. Cunningham*, Attorney General, and *W. B. Sommerville* and
*Omer Villeré* for the State, Plaintiff and Appellee:

1. The law of Louisiana, like that of France, calls the State to a succession in two capacities: as heir at law and as trustee. C. C. 929; C. N. 768; C. C. 485; C. N. 539; 6 Duranton, 344, 345; 12 R. 584; 3 La. 374; 6 La. 653; 5 Rob. 9; 11 Ann. 59.

2. "The succession of persons who die without heirs, or which are not claimed by those having a right to them. belong to the State." C. C. arts. 485, 917 and 929.

3. The State is an irregular heir, and must be decreed so to be, when she comes into court and sets up her claim to a succession, and is not successfully opposed by one having a greater right than herself, and she is not required to show that there are no other heirs. 2 Mourlon, Nos. 193, 194, 195, 196, 197: 9 Laurent, 250; 6 Aubry & Rau, § 639.

4. The succession of Townsend is not *vacant*, because Sykes, the instituted heir, and the State, the heir at law, both went into court and set up claims of heirship thereto. C. C. 1095; C. N. 811; 2 Mourlon, 312.

5. "A succession is called vacant when no one claims it, or when all the heirs are unknown, or when all the known heirs to it have renounced it. C. C. art. 1095; 2 Mourlon, No. 312, 191. 183, 196, 197; 38 Ann. 243.

6. "The funds of vacant successions or absent heirs. paid into the treasury of the State, remain in deposit until claimed by the heirs or those having a right to them " C.C.1204; C. N. 811, 812, 813.

7. The two last cited articles have no application to this case, because two known heirs, the State and Sykes are in court claiming the succession of Townsend, which, for that reason, is not *vacant*, and the court cannot therefore order the proceeds thereof paid into the State treasury under Art. 1204, C. C.; C. N. 813; 9 Laurent, No. 250; 6 Aubry & Rau, § 639.

8. Sykes has been declared, at the instance of another heir, the State, to be unworthy to inherit from Townsend, and no known heir is before the court contesting the right of the State to inherit; therefore "in case a succession be opened in favor of a person whose existence is not known, *such inheritance shall devolve exclusively on those * * * on whom the inheritance should have devolved if such person had not existed*," C. C. art. 77; which, in the instant case, is the State of Louisiana. C. N. 136, 137, 138; C. C. 76; C.N. 135; 2 Laurent, 257, 202, 254; Mortifs du Code Civil (Discours) p. 98; 1 Marcadé, No. 464; 466; 1 Aubry & Rau, 630; 1 Mourlon, 265; 2 Demolombe (Absence), 247; 1 Duranton, 555; 2 Laurent, 555; Dalloz. Vo. Absence, Nos. 504 et seq.

9. The State is claiming in her own right as heir, and not through any absent person, and art. 76, C. C., is not therefore applicable.

10. It cannot follow because Tulley et als. have failed to establish their heirship that the undisputed heir, the State in this case, who is in possession, must be ousted and her heirship denied.

11. Particularly is this the case when the State went into court, asserting her right as heir, and had Sykes, the instituted heir, divested of his title, by a final judgment in her favor, declaring her to be irregular heir; and when this judgment is unappealed from or attacked in any manner by him against whom it is pronounced.

12. Courts are without authority to revise, reverse, amend, or set aside judgments which are not appealed from or attacked by those against whom they operate.

13. Intervenors, in their petition, admit the heirship of the State, and sue her as heir, setting up their claim to superior heirship based on blood relationship. It is from the judgment

denying their claim of heirship and superiority only that they have appealed or of which they can be heard to complain.

14. Intervenors do not and cannot deny the heirship of the State, because Sykes could not have been destituted by any one except an heir, C. C. art. 974; suit for that purpose had to be instituted within one year after the commission of the act which made him unworthy to inherit. C. C. arts. 1711 and 1561; the State was within the term of prescription; the intervenors were not.

15. The public administrator did not (and could not, being dative testamentary executor), attack the testamentary disposition in favor of Sykes.

16. The Appellate Court cannot render a judgment which the court a qua could not render. 6 N. S. 457; Hennen Vo. Appeal IX (a) No. 3, p. 90.

17. The lower court was compelled to decide, under the law, that the State was an irregular heir, therefore capable of suing to destitute Sykes on the ground of unworthiness, before it could decide, under the evidence, that Sykes was unworthy, and thus deprive him of his rights as instituted heir. There has been no change in the pleadings, and this court cannot therefore render a judgment declaring the State not to be the irregular heir, because the judge a qua could not have rendered such a decision, and have destituted Sykes at the same time.

18. The effect of annulling and setting aside the judgment of the lower court, is to strike it with nullity in all its parts: such decree cannot be partial in its operation; and if there is no judgment Sykes has not been declared unworthy of inheriting; and the State is thus deprived of her property, a final judgment rendered by a competent court against Sykes, when Sykes is not complaining of such decree, but has fully acquiesced in its operation. Said judgment cannot be good and final against the defendant, when it is not good and final in favor of the plaintiff.

19. The effect of a judgment of non-suit is to turn plaintiff out of court and to place him as though he had never filed proceedings; 35 Ill. 396; 43 Conn. 61. It can have no possible effect on the defendant to the cause.

20. The judgment of the court declaring the State to be irregular heir cannot deprive any heir who may hereafter present himself of his rights; she holds, like any other heir put in possession of an estate, subject to any one having superior rights.

21. "The Supreme Court of Louisiana is without jurisdiction to revise a judgment in favor of one who has not himself appealed, and who has not made an answer to the appeal of his adversary." Morris et als. vs. Cain et als., 1 So. Rep. 797, and authorities there cited.

22. "The appellees in the instant case (Sykes and the Public Administrator) have neither joined appellants, nor answered their appeal. In so far as they are concerned, the decree of the court a qua must remain undisturbed." Ib. p. 806; Leeds vs. Jones, 37 Ann. 427.

23. A careful perusal of the evidence in this case is asked, in the confident assurance that your Honors will agree with the trial Judge and ourselves that Kate Townsend could not have been Bridget Cunningham; that aside from the differences in their appearances, ages, education, etc., they were so different in their nature and dispositions, as disclosed in the record, that they could not have been one person.

24. The judgment of the trial Judge on questions of fact should be affirmed unless clearly erroneous. Hennon Vo. Appeal IX (b) No. 1, p. 92.

### Merrick & Merrick for Intervenors, Appellants.

1. The allegation in a petition that one is heir at law, and thereby demanding to be put in possession, as owner, is inconsistent with the argument that the estate is a vacant succession. And this principle applies to the State claiming to be the irregular heir, under C. C., art. 929, as well as to the husband or wife or natural children. 5 Rob. 12; 11 Ann. 62.

And where the State, as against the public administrator, is decreed to be the heir and owner of a succession, it is no longer subject to the rules of law governing vacant estates.

2. The State like any other litigant, is bound to administer proof of its allegations. There is no law which creates presumptions in favor of the State, so as to dispense with proof.

3. Courts of justice follow the usual ordinary and probable course of events, and where a case is made out by proof. with reasonable certainty, in harmony with such ordinary course of events, the court will not, on the bare suggestion, without proof, that the unusual, uncommon and improbable might have happened, refuse to follow the former and thus give credence to the latter.

*A. J. Murphy* for Defendant and Appellee.

*Breaux & Hall* for the Public Administrator, Appellee.

The opinion of the Court was delivered by

POCHÉ, J.   This litigation involves the question of the title to the property left by Kate Townsend, a noted courtesan, who died in New Orleans on the 3d of November, 1883.

At her death she left a will by notarial act, executed on the 9th of September, 1873, by which she bequeathed all her property to one Troisville E. Sykes, whom she therein instituted her universal legatee, appointing him also executor of her said will.

In December of the same year the State brought the present suit for the purpose of annulling and setting aside the will on several grounds, the principal of which was that Sykes, the universal legatee had murdered the testatrix.

Pending this litigation between the State and Sykes, which also involved the alleged right of the State to the ownership and possession of the succession property in default of heirs, a petition of intervention was filed by Mrs. Bridget Cunningham claiming to be the mother, by Mrs. Ellen Tully, claiming to be the sister, by Timothy J. Cunningham, claiming to be the brother, and by Mrs. Mary Connolly, claiming to be the niece of the deceased, and thus seeking to be recognized as her heirs at law.

Intervenors joined the State in seeking the nullity of the will, but opposed the demand of the State to be called to the succession, which they claimed as the legal heirs of the deceased.

The trial below resulted in a judgment which annulled and set aside the will of Kate Townsend, rejected the demand of intervenors, decreed the State to be the heir at law of the deceased, and entitled as such to the ownership and possession of all the property belonging to the succession.   From that judgment intervenors alone have appealed, and thus the issue presented to this court is restricted to the conflicting claims urged by them and by the State.

The claim of the State is predicated on the various articles of the Civil Code which provide in substance that the State inherits in default of relations, a surviving husband or wife, acknowledged natural children or valid donations.

Article 485 of the Code reads: "The successions of persons who die without heirs, or which are not claimed by those having a right to them, belong to the State."

Article 917 is as follows: "When the deceased has left neither lawful descendants, nor lawful ascendants, nor collateral relations, the law calls to his inheritance, either the surviving husband or wife, or his or her natural children, or the State, in the manner and order hereafter directed."

Article 929 provides that: "In defect of lawful relations, or of a surviving husband or wife, or acknowledged natural children, the succession belongs to the State."

Article 1095 reads: "A succession is called vacant when no one claims it, or when all the heirs are unknown, or when all the known heirs to it have renounced it."

Article 1204 contains the following provisions: "The funds of vacant successions or absent heirs, paid into the Treasury of the State, remain in deposit until claimed by the heirs or those having a right to them."

"These funds may be made use of, but their reimbursement is provided for and guaranteed on the faith of the State, so that the heirs, who present themselves, meet with no delay in receiving them."

And it may be noted that in this connection, Article 229 of the State Constitution proposes to make the following disposition of such funds: "The school funds of this State shall consist of:"        *        *        *
"5. The proceeds of vacant estates falling under the law to the State of Louisiana." Under the effect of the unappealed portion of the judgment rendered in the case, the court has no concern with the question of the existence of a valid donation as the projected testamentary donation has been annihilated, and the record suggests no inquiry under the issues to be reviewed, as to the existence or right of a surviving husband, or of lawful descendants or of natural children.

Hence the inquiry must be directed to the alleged existence, and claims of a lawful ascendant and of collateral relations.

These are the claims urged by the intervenors, who rest their right of recovering the succession on the following facts: That the true name of Kate Townsend was "Bridget Cunningham," who was born about the year 1833, in the town of "Rashina," King's county, Ireland,

of the lawful marriage of George Cunningham, now dead, and of Bridget Mitchell, now the widow of George Cunningham, and one of the intervenors herein. That Bridget Cunningham left Ireland in the year 1849, and soon thereafter landed in the city of New York, State of New York, where she remained in the company of friends and acquaintances for the space of about one year, after which she disappeared, and was no more seen or heard of by any of the members of her family until her death in this city in November, 1883, when she was killed under the assumed name of "Kate Townsend," which name she had assumed in order to conceal her identity, by reason of the life of shame, as a prostitute, which she had led in this city for many years previous to her death.

On the part of the State, it is contended that Kate Townsend never bore the name of "Bridget Cunningham," that she has no mother, brother or sister or other collateral relations living, that she came directly from Liverpool to New Orleans in the year 1858, under the name of "Martha Wingfield" which was itself an assumed name. That at the date of her arrival here, she was not more than eighteen or nineteen years of age, and that therefore she could not have been born in or about the year 1833. It is also contended that Kate Townsend was the natural and adulterous child of a woman who died in London before the departure of her daughter, who was her only child, for this country, and that Kate Townsend never was in New York previous to her arrival in this city in the year 1858.

The trial of those issues lasted weeks in the district court, culminating in an enormous record containing nearly four thousand pages of testimony, an examination of which by this court consumed several months of time and of incessant labor.

During the progress of the trial below several hundred bills of exception were reserved from the various rulings of the district judge, by both parties, but principally by intervenors' counsel. Fortunately for the administration of justice by this court in its other business, many of those bills have been practically abandoned on appeal, and those which call for rulings here, can be classified, and thus more easily disposed of.

One of the main grounds of contention below grew out of the oft reiterated objections by intervenors' counsel to the right, claimed by counsel for the State, to propound on cross-examination leading questions to the numerous witnesses who were introduced by the defendant, Sykes. An inspection of the record shows that on some of the issues

to be solved under the pleadings; for instance, the alleged identity of "Kate Townsend" and "Bridget Cunningham," the interests of Sykes were identical with those of the State, and on the other hand, on the issue of Sykes' alleged incapacity and unworthiness as a legatee, the interests of the State were common with those of intervenors.

In a contest between three parties, such a feature is frequently unavoidable. But such an incident did not and could not affect or destroy the nature of the issues which were clearly made out by the pleadings between the parties. Hence such a circumstance could not placate the antagonism between the State and Sykes, more than it could reconcile the differences between the State and the intervenors, or between Sykes and the latter. Hence there was no feature of the trial which could remove the mode of examining witnesses beyond the scope of the familiar rule which authorizes leading questions by one of the parties, to the witnesses introduced by his adversary in the litigation. Hence the district judge must be upheld in his rulings which conformed with these views.

The State complains of several rulings of the judge touching the mode of conducting the trial. It appears that intervenors were allowed to suspend the introduction of their testimony owing to the absence of some of their witnesses, during which interruption, Sykes and the State were required, over their objections, to present their testimony. While it is true, as contended for by the State, that this ruling favored intervenors, in so far as it resulted in informing them of the means of defence which they had to meet, yet it is clear that it was made within the legal discretion vested in all trial judges. Hence, such rulings cannot be reversed by an appellate court.

On appeal intervenors invoke a ruling on one of their numerous bills of exception, which is levelled at the ruling of the judge in denying their motion to strike out of the record the entire testimony of a Mrs. Margaret Littlefield, a witness introduced by the Defendant Sykes. The motion was predicated on the ground that the witness had failed to appear on a day fixed by the court for the purpose of being further cross-examined by intervenors' counsel, and that notwithstanding diligent search the witness could not be found in the city.

This ruling is also covered and protected by the legal discretion of the judge, and should not be disturbed unless it should appear to be glaringly erroneous and unjustly arbitrary.

A similar question was considered by this court in the case of the succession of Rieger. 37 Ann., p. 104.

It appears in that case that while Widow Rieger was being cross-examined, after she had given testimony in her favor in her examination in chief, she complained of being sick, and at her request the cross-examination was postponed to next day, and that having persisted in absenting herself on repeated occasions on which she was to be cross-examined, the trial judge, on motion of opposite counsel, struck out her testimony. In disposing of a bill of exception reserved by her counsel to the action of the judge, this court said:

" We are not disposed to interfere with the discretion wisely vested in courts of the first instance in their rulings on such points. If the judge believed, as he had every reason to conclude, that this party, by her persistent failure to submit to a cross-examination, and by her conduct impeded the settlement of the succession which she represented, with possession of all the property, it was his duty to put an end to such a state of things. After due warning to her counsel, the judge used the most efficient means of preventing a denial of justice, and we cannot take the responsibility of disturbing his ruling."

In the instant case a recital of the circumstances under which the trial judge made his ruling will show that he did not act in an arbitrary manner.

The record discloses that the witness had no apparent or possible interest in the result of the controversy on trial, and that the testimony which she had given had a very striking and important bearing on the vital issue in the cause, between the State and intervenors. It also appears that she had been rigorously cross-examined and at great length by counsel for the State and of intervenors, her cross-examination covering over one hundred and forty pages of the record, and that in the course of her testimony she had taken occasion to state that she was actively engaged in looking for a situation as stewardess on an ocean vessel, which was her ordinary occupation. The record also shows that on a day intervening between the date on which she had been notified to appear for further cross-examination, and the day fixed for her return into court, she had appeared in court for the purpose of being identified by some of the witnesses in the case, on which occasion the attorney of Sykes, by whom she had been introduced, reminded the court and intervenors' counsel, of her previous statement touching her search for occupation as stewardess on a vessel, and suggested the propriety of resuming her cross-examination on that day. The offer was declined by counsel for intervenors, and on the day fixed for her appearance, the witness could not be found.

Under such circumstances the judge's ruling must remain undis-turbed, especially as he added that her testimony would be materially weakened by the line of conduct which she had seen fit to follow in the premises.

It may be proper to state here that in the consideration of the testi-mony of that witness in this opinion, those of her statements only which are corroborated in the record, have carried any weight in the scales.

It is believed that the status of this witness as thus reduced will no longer be a subject of legitimate complaint on the part of intervenors.

Although the pivotal issue in the case hinges upon a question of fact, the discussion involves at the threshold of the investigation the solution of a point of law raised by intervenors' counsel. Their pro-position is that the burden of proof is on the State, whose right to re-cover the property is in law dependent upon positive proof of the con-ditions which vest the succession in the State. They assimilate the legal status of the State to a plaintiff in a petitory action, who must recover on the strength of his own title and not on the weakness of his adversary's.

This may have been true of the position of the State towards Sykes, defendant in the cause, but it is not a fair illustration of the relative position between the State and intervenors. As stated, we have no concern in the present discussion with the correctness or validity of the judgment rendered in favor of the State and against Sykes, on the issues which were tendered to the latter as defendant in the original suit. Equally with, and as much as the State, intervenors are inter-ested in the assumed validity and binding force of that judgment. But under their pleadings intervenors have assumed the legal attitude of opposing both of the original parties to the suit. C. P. 389.

Even with the judgment which has annulled the last will and testament of Kate Townsend, the condition and groundwork of their success in recovering the property of the succession, is the alleged fact of their being respectively the lawful ascendant, and the lawful collateral relations of the deceased; and in default of proof of that fact they are defeated, and must go out of court.

In that contingency they have no standing in court for the purpose of inquiring into or discussing the rights of the State to obtain posses-sion of the succession.

Either they are heirs-at-law as alleged by themselves, or they are not. If they are such heirs, then the case is with them, and the State goes out of Court. But if the proof fails to show with legal certainty

that they are the lawful heirs of Kate Townsend, they are entirely out of the case, without interest in, or concern with, the eventual disposition of the property left by Kate Townsend.   Towards the State they occupy precisely the legal attitude of a plaintiff in a petitory action.

Their true legal attitude in the case is tersely described by this Court in the case of the succession of Fletcher, 11 Ann. 59.   In that case, one Marie Louise claimed, as an acknowledged natural child of the deceased, adversely to other claimants styling themselves the cousins of the deceased, and to the State.   After rejecting the prayer of the pretended cousins, the court proceeded to investigate the conflicting claims of the State and of Marie Louise, who succeeded in proving that she was the acknowledged natural child of the deceased. Whereupon the State proposed to prove that she was an adulterous child, and as such disqualified in law from inheriting.   But counsel for Marie Louise denied the right of the State to inaugurate that investigation, contending that her heirship having been established, the State was powerless to show by any extraneous evidence the existence of facts which would cut her off from the inheritance.

In passing on that contention, the court said:

" Marie Louise is not then in the posture of a defendant with a legal possession which is attacked by the State, but she is an actor seeking by proof to get herself recognized as an heir to an inheritance which cannot be given to her without establishing her heirship. * *   She must therefore make out her case like other plaintiffs, and when apparently made out it is open to be rebutted. * * *

"That the State has an interest in defeating the unlawful pretentions of Marie Louise in this case is obvious, under the testimony which shows that there are no legitimate heirs or surviving wife."

Hence, it is perfectly safe to conclude in the instant case that intervenors who are seeking an inheritance as heirs-at-law, must establish their heirship.   Layre vs. Pasco, 5 Rob. 9.   Under the pleadings and according to the law, as just expounded, which governs the case, the burden is on intervenors to prove with legal certainty that Kate Townsend, whose succession they claim as her only heirs at law, was the identical "Bridget Cunningham," who was born in Rashina, King's county, Ireland, in or about the year 1833, who was the daughter of Widow Bridget Cunningham, the sister of Timothy J. Cunningham, and of Ellen Cunningham, Widow Tully, and the aunt of Mary Connolly, the four claimants herein.

As stated above, it is conceded by all parties and it appears beyond a reasonable doubt from the record that Kate Townsend never mar-

ried and has left no descendants, legitimate or otherwise, and under
the showing intervenois are entitled to her succession if they succeed
in proving their alleged capacity as heirs at law.

The evidence introduced by intervenors, besides their own testimony,
consists of the testimony of several witnesses who reside in Ireland, of
some who reside in New York, and of others who reside in California,
taken under commissions; and of the testimony of numerous witnesses
who reside in this State, and in this city, whose testimony was taken
in open court.    From their own testimony and that of the wit-
nesses who reside in Ireland, of those who reside in New
York and in California, who all came originally from Ireland,
it appears satisfactorily that there was such a person as Bridget
Cunningham, who was born about the year 1833, in the town
of Rashina, King's county, Ireland, of the lawful marriage of George
Cunningham and Bridget Mitchell.    She had a half-brother by the
name of George Cunningham, since deceased, who was the father of
Mary Connolly, one of the intervenors in this suit.    Her brothers and
sisters of full blood were Timothy Jerome, now a resident of Califor-
nia; Ellen, now Widow Tully, residing in California, both intervenors,
Mary and Anne, who both died in Ireland in infancy, and Laurence
and William, who both came to America, and who are supposed to be
dead, or whose whereabouts and fate are entirely unknown to their
relatives.    Widow Bridget Cunningham, eighty-four years of age, is
still living and resides in California with her daughter, Widow Ellen
Tully.

In July, 1849, Bridget Cunningham left home for America, in com-
pany with her brother Timothy.    But at Liverpool they separated;
Bridget sailing for New York, where she landed in due time, and Tim-
othy sailing for Boston, where he remained a short time.    He then
came to New York, where he diligently searched for his sister Bridget,
but was unable to find her.

Bridget Cunningham remained in New York for one year, spending
her time with friends who had preceded her to that city from King's
county, Ireland, and whom she had known in the old country.    On a
certain day in 1850 she left the house of one of those friends with
whom she had spent the better part of her time, saying that she was
going out to look for a situation, and from that day to the present
time she was never seen or heard of as "Bridget Cunningham," by any
of her friends in New York, her relatives in California, her friends in
Ireland, or any of the witnesses who have testified in the case.

Now from the evidence introduced by intervenor's opponents, and

principally by the defendant Sykes, consisting mainly of the testimony of witnesses who are uncontradicted, unimpeached and unimpeachable, it is shown conclusively that Kate Townsend arrived in New Orleans at the end of September, 1858, direct from Liverpool in a sailing vessel, in company with another person who was known in New Orleans under the name of "Ida Moore," a member of the society known as the *demi-monde*, who subsequently became blind, and who in consequence thereof returned to England, where she died a few years later.

On the passenger list of the vessel which carried these two interesting travelers, their names are entered as "Mary Ann Wingfield" (who became Ida Moore) and "Martha Wingfield," who became "Kate Townsend," and who thenceforth never went by any other name. Kate Townsend, immediately after her arrival in New Orleans, began the life of a prostitute, which she never abandoned, having gone through all the grades of that class, ending as the proprietress of a large and well known house of that kind. She made her home in New Orleans, which she left for two short absences during the late civil war only, and for occasional trips to New York city and other northern and western cities.

Numerous witnesses, some of whom have known Kate Townsend from 1858 to the time of her death, others for a number of years, have all testified in that sense, and according to the preponderance of their testimony she was, in 1858, of the age of eighteen to twenty years.

These are the only salient facts in the case which are established with any legal certainty.

On all other points in the controversy the testimony is distressingly conflicting; much of it is self-contradictory and self-destructive, from the examination and study of which the mind turns back disgusted, bewildered and unsettled in any conviction.

But intervenors, feeling the obligation to identify the lost "Bridget Cunningham" as the murdered "Kate Townsend," of New Orleans, and being entirely unable to introduce a single witness who could give direct testimony of the fate of Bridget Cunningham after her disappearance from the house of her friend in New York in 1850, have had recourse to secondary evidence to accomplish that purpose.

One of the means resorted to has been to show the physical resemblance between Bridget Cunningham and photographs and other likenesses taken from Kate Townsend. It must be noted at this point that no witnesses who had seen Bridget Cunningham before her disappearance in 1850 ever saw Kate Townsend after the year 1858, when she arrived in New Orleans. Hence intervenors have introduced in

evidence a daguerrotype taken some time between 1858 and 1865, two photographs taken in 1870, and another taken in 1880, all shown to have been intended as likenesses of Kate Townsend, all of which have by consent of counsel been submitted to us for inspection and comparison, together with a photograph taken of Mrs. Ellen Tully, one of the intervenors; as several of the wituesses have testified to a strong resemblance between her and the deceased.

We agree with several experts who have testified in the case that this mode of detecting resemblance between persons, especially by means of pictures or likenesses is far from being reliable to establish identity. Their opinion is illustrated by our experience in this very case. Differing from several witnesses in the cause, we entirely fail to detect any resemblance between any of the pictures taken of the deceased and the photograph taken of Mrs. Ellen Tully. And in perfect accord with several of the experts, we detect very little or no resemblance between the photographs taken of the deceased in 1870 and the one taken in 1880, and none at all between the latter and the daguerrotype taken in 1858 or 1860. And yet we find the witnesses in Ireland asserting in their testimony that they see a very striking resemblance, satisfactory to them as a complete identity between the photograph of 1880 and Bridget Cunningham as she appeared to them in 1849. She is described by them as being at that time a handsome, well-shaped, well-proportioned lass, with a fair complexion, with dark eyes and dark hair, with regular, well defined and handsome features, whereas the photograph of 1880 represents an enormous woman weighing nearly 300 pounds, almost a fleshy monstrosity, with a face and a bust almost distorted with unshapely and fat flesh, taken thirty-one years after they had lost sight of Bridget Cunningham, of whom they had no likeness taken of her at any time in her youth, as an indispensable point of comparison. Evidently the " wish must have been father to the thought " in inspiring such opinions. The same may be said of the New York witnesses who detected the same resemblance, and particularly of one of the number, who found a striking resemblance between the photograph of 1880 and those of 1870, the latter of which are admitted by all the witnesses who knew Kate Townsend as the best extant pictures of her. The artist who took that of 1880 admits himself that it bears very little likeness to the deceased; and the other experts testify that unless told so they could not even suspect that the photograph in question had been taken from Kate Townsend.

The question of resemblance, either between the deceased and

Ellen Tully or between Bridget Cunningham and the pictures ·
of Kate Townsend may therefore be dismissed as a very weak
link in the chain of evidence necessary to establish the alleged
identity of the lost sister with the unfortunate deceased. Inter-
venors also rely on the testimony of several witnesses, principally
dress-makers, hair-dressers, chambermaids, washerwomen and
other servants, who state that while in the employ of Kate
Townsend she had told them in secret confidence that her
name was "Cunningham," and to some "Bridget Cunningham;"
that she was born in Rashina, King's county, Ireland, where she had a
mother, a sister named Ellen, and brothers. The most striking feature
of that testimony is that while those family secrets have been confided
to some of the witnesses as far back as nineteen years before the trial
below, and had been repeated on subsequent occasions and at divers ·
times, nothing was ever said or divulged to any one of the witnesses
in the presence of any other person. Another extraordinary feature
is that two or three illiterate women, who don't know their own
ages, cannot remember the names of the streets which they lived on,
who cannot remember whether they were married or single at the time
when such disclosures were made, can distinctly remember *Rashina*,
the name of Kate's birth-place, which they had heard but once, and
that eighteen or nineteen years before they gave this testimony.

There must be a limit to judicial as well as to human credulity,
especially when considering testimony concerning statements by a
person since deceased. Jurisprudence has invariably ranked such
evidence as of the weakest kind.

In the case of Bringier vs. Gordon, 14 Ann. 274, this Court, in deal-
ing with that kind of evidence, used the following emphatic language :
" The evidence offered consists of the verbal admissions or acknowl-
edgements of the deceased to a single witness, made at a particular
time and place, when the deceased and witness were alone."

" The impossibility of .contradicting a witness under such circum-
stances, and his entire immunity from temporal punishment for false
swearing, have induced the courts to receive such testimony with dis-
favor, and to declare it the weakest species of evidence known to the
law."

Treating of the same subject, the present Court has recently said :
" Extra judicial admissions of a dead man are the weakest of all
evidence. They cannot be contradicted. No fear of detection in false
swearing impends over the witness. In most instances such testimony

is scarcely worthy of consideration." Bodenheimer vs. Executor, 35 Ann. 1005.

It is thus apparent that by means of that testimony intervenors have not yet succeeded to fill the judicial measure of evidence to establish identity.

They next invoke the concidence that Bridget Cunningham had the small-pox when quite young, in consequence of which she was slightly pock-marked; and that Kate Townsend was also pock-marked on the left side of the nose and cheek. But the evidence does not show the identity of the marks, as intervenors' witnesses do not describe the precise spot of Bridget's face which showed the marks. But even if the marks were identical, it would only be a strong coincidence which together with other links might contribute to complete the chain of evidence necessary to identity; but as it stands in the record, it amounts to nothing more than a coincidence.

This analysis of the evidence, and of the strongest points urged by intervenors, leads logically to the conclusion that they have not made out their case, and that they should be non-suited.

But counsel for the state very confidently argue that there is sufficient evidence in the record to justify and even to dictate an absolute judgment against intervenors; and those views prevailed with the district judge.

The contention is that on the question of identity the testimony against intervenors is strong enough to establish a negative, and to show conclusively that "Bridget Cunningham" could not be, and never was, "Kate Townsend."

In that line of argument they invoke the testimony which shows that Bridget Cunningham had dark hair and dark eyes, with a corresponding complexion, whereas Kate Townsend is positively shown to have been a blonde, with light brown hair, hazel or light brown eyes, and of fair complexion. In that connection the evidence is not conclusive either way. The difference in the shade of the color of the human eye, between a dark and a brown eye, is not so easily perceptible as to be seized with sufficient accuracy so as to rest a judicial conclusion, without actual inspection of the person who is the subject of discussion. And, hence, it occurs, as it is inevitable in such matters, that the witnesses who knew the deceased who try to describe the color and shade of her eyes, are not all of the same opinion. As to the color of her hair, the record shows that she used ingredients by which she operated a change in its color and general appearance as she advanced in age. The difference on that ground is not sufficiently marked as to

preclude the possibility of "Bridget Cunningham" and "Kate Townsend" being one and the same person. It is also contended on the part of the State that it appears conclusively from the preponderance of the evidence that Bridget Cunningham could read and write, whereas it appears as conclusively that when Kate Townsend arrived here, and for several years thereafter, she did not know one letter of the alphabet from the other, and that all the writing which she was ever able to do, even after being patiently taught, was to make her signature, which she had been taught to write mechanically.

The evidence does show that condition of things as to Kate Townsend, but on the other hand it does not appear satisfactorily that Bridget Cunningham was much more advanced in education or learning. She did go to school for several years, but it is shown that the school was not very efficient, that the girl was wild, unruly and not at all studious, and that she could read but very little. Hence, that point is not conclusive in favor of the State.

The next contention is that Bridget Cunningham was born between 1830 and 1833, whereas Kate Townsend could not have been born before 1840, as she is shown to have been only 18 years of age on her arrival here in 1858. There is no conclusive evidence on either point of that contention, and all the testimony touching the age of Kate Townsend is mere opinion and guesswork. No two witnesses precisely agree as to her age, and according to some of the most creditable witnesses she might have been 25 years of age in 1858, which would likewise have been the age of Bridget Cunningham, for it appears from the preponderance of the evidence that she was born about the year 1833. This appears from the testimony of her mother, of her brother and of her sister. On this point of identity, the intervenors had it within their power to establish the age of Bridget Cunningham with legal certainty, and it is somewhat singular, if not suspicious, that they failed to use the easy means which were in their reach. In her testimony Mrs. Ellen Tully says positively that all the Cunningham children, including Bridget, were baptized immediately after their birth in a Catholic Church situated in the village of "*Ballinahound*," at a distance of two miles from Rashina. Now this Court takes judicial cognizance of the universal custom in all the Catholic Churches in the world, that a registry of baptisms is kept with great care, and that extracts from such registers, duly attested, are legal evidence in the courts of Louisiana. Intervenors took the testimony of several witnesses in King's county, Ireland. Why did they neglect to provide for that particular link in their chain of evidence?"

But the apparant discrepancy in the ages of the two persons is not conclusive.

There is no more force in the contention that because Bridget Cunningham sailed from Liverpool to New York in 1849, and Kate Townsend came directly to New Orleans from Liverpool in 1858, they could not be one and the same person.

As neither party has shown what became of Bridget Cunningham after her disappearance in New York in 1850, there is no actual impossibility of her having returned to England and of her coming thence in 1858. Intervenors have failed to show that she did return to England; hence their case stands without that important link in the chain; but the State has on the other hand failed to show that she had not thus returned, hence her counsel cannot claim a judicial declaration of their negative but unsupported assertion.

It is true that Mrs. Littlefield testifies to have known the deceased in London in 1852 or 1853 under the name of "Kate Neal," but she might have changed her name then as easily as she changed it later on. The statements of the witness that "Kate Neal" had come with her mother from Waterford county, Ireland, to London, where she had lived continuously up to the time that Mrs. Littlefield met her there, were made as coming from Kate's alleged mother, and from Kate herself, hence her testimony on that point is partly hearsay, and partly the statement of a deceased person, and as such, not entitled to more favorable consideration than similar testimony emanating from intervenors' witnesses, as herein above disposed of.

The same reasoning may be applied to the testimony of numerous witnesses who state that Kate Townsend had repeatedly told them that she had never been to New York previous to the year 1870, and that she had no father, mother or relatives "on the top of the world." No more conclusive is her declaration in her will that she had "no father or mother living and no forced heirs." It is admitted on all sides that her name was not "Kate Townsend," and yet in her will she formally declared that it was. This case forms an exception from the general rule of jurisprudence which gives great weight to the declarations of facts made by a testator in his last will.

These premises, established after a long and tedious study of the case, lead to the logical conclusion of a judgment of non-suit against intervenors. And, under the effect of such a decree, it stands to reason that the State cannot recover an absolute judgment decreeing her an irregular heir of the succession, but the only decree to be rendered in her favor is to place her in possession of the property of the de-

ceased under the provisions of Article 1204 of the Civil Code, which is hereinabove transcribed in full.

In accordance with the general rule of our law and of our jurisprudence the appellee should be condemned to pay the costs of this appeal.

But as a litigant the State is an exception to the general rule, as in no case the sovereign can be held liable for costs of litigation in his own courts.  State vs. Richard Taylor, 33 Ann. 1272; State vs. Miles Taylor, 34 Ann. 978.

But as this suit is an incident of the settlement of the succession of the deceased, the apparent difficulty growing out of the State's immunity from the payment of costs is easily obviated and full justice done by taxing the costs against the succession itself.

It is therefore ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed, and proceeding to render such a judgment as should have been rendered below, it is ordered, adjudged and decreed that the claim herein propounded by intervenors, Widow Bridget Cunningham, Widow Ellen Tully, Timothy J. Cunningham and Mary Connolly be rejected, and that their petition of intervention be dismissed, as in case of non-suit; and it is ordered that the State of Louisiana be decreed to be entitled to the possession of all the property belonging to the succession of Kate Townsend, and it is therefore ordered that after due administration of said succession, after payment of its debts and after the payment of the costs of this appeal, which are hereby taxed against the succession aforesaid, the residue of the property of said succession be turned over and paid into the Treasury of the State of Louisiana, to remain therein deposited, and further dealt with according to law and to the views herein expressed.

### SEPARATE OPINION.

FENNER, J.  I differ from the majority of the court in my appreciation of the evidence in support of the claims of intervenors.

Bridget Cunningham, a beautiful young Irish girl, born in 1833, in Rashina, Kings County, Ireland, daughter of George and Bridget Cunningham, having a sister two years younger named Ellen, and several brothers, left Ireland in 1849, went to Liverpool and thence sailed to New York.

In New York she was known and entertained by various acquaintances and friends of the Cunningham family, and led there, so far as known, a virtuous life until about 1850, when she suddenly disappeared

without any apparent cause, and under no suspicious circumstances, and has never since been heard of by her family or friends. There is no evidence that she died, and there was no known reason for her se-creting herself.

When a beautiful girl thus vanishes and conceals herself, if death has not overtaken her, the unhappy inference is natural that she has fallen from virtue and adopted a life of shame.

In 1858, there arrived in this city, on an emigrant ship which sailed direct from Liverpool, a beautiful young Irish girl, a prostitute, who assumed the admittedly false name of Kate Townsend, under which she lived and pursued her disgraceful calling until her tragic death in 1883.

The New York Police Gazette, in its contemporaneous account of that thrilling tragedy, published pictures of Kate Townsend, and con-tained the statement that she was of Irish birth, and that her true name was Bridget Cunningham.

A copy of this paper reached the relatives of Bridget, and formed the first clue they had ever discovered to the possible fate of the lost daughter and sister.

The statements as to her name and origin above mentioned, together with resemblance discovered, or fancied in the pictures, led to further inquiries, and finally culminated in the institution of the present inter-vention, in which they claim the identity of Kate Townsend with Bridget Cunningham, and that they are her lawful heirs.

I fully agree with the majority opinion in the legal proposition that intervenors carry the burden of proof, to establish, with reasonable certainty, the identity asserted, and their consequent heirship.

Have they discharged this burden?

I find the following facts and circumstances in their favor, which have great weight on my judgment:

1. If Bridget Cunningham did not die, of which there is not the slightest evidence, actual or presumptive, her sudden disappearance and persistent concealment make it probable, as I have said, that she resorted to a life of shame, and her subsequent discovery in the char-acter of a prostitute would be entirely reasonable and natural?

2. Bridget's going to Liverpool, when she vanished from New York, is equally natural, because that was the only route from New York with which she was acquainted, being the one by which she had come. An additional circumstance strengthening this probability is the fact that she bore on her arm the name " A. Pimm," tattooed after the fashion peculiar to sailors, indicating that her seducer was of that call-

ing, and thus making likely her departure from New York by sea and her appearance in the great port of Liverpool, which bears to sailors the same relation which Rome bore to Italians in being a place to which "all roads lead." The coming of Kate Townsend from Liver‑ pool to this city is thus, in no way, out of harmony with the identity claimed.

3. If Bridget lived she would have been twenty-five years of age in 1858. The testimony as to Kate's age when she arrived here in that year is conflicting, and is based on opinions of those who knew her and on her own statements. Some estimate her age as high as twenty-five, others as low as eighteen. Considering the deceptiveness of appearances as between such periods of life, and the tendency of woman of her class to understate their age, I think the conclusion justifiable that there was no disparity of age hostile to identity.

4. As to color of hair and eyes, stature and general physical type, and as to education, there are some apparent conflicts in the evidence, of little value, and easily reconcilable, but, taken as a whole, it establishes, in my judgment, a substantial correspondence.

5. No photograph or other image of Bridget Cunningham, taken before her disappearance, exists; but every witness produced who ever saw her (and they are numerous), testifies emphatically to the recognition of her likeness in the photographs of Kate Townsend. The honesty and respectability of these witnesses are unimpeached; some of them are entirely disinterested; and, while time undoubtedly makes great changes in human appearance, these changes are much less in some persons than in others, and human experience does not forbid the belief that the original stamp imprinted by Mother Nature may remain legible amid all the changes wrought by middle age and obesity. We have had before us photographs of Kate, one taken before 1860, representing a slender youthful woman, and others taken long afterwards, when she had become abnormally fleshy, and the identity is perfectly apparent—the resemblance being very much greater than between two of her photographs taken by different artists at about the same time.

6. Numerous witnesses who knew Kate Townsend, on seeing her alleged sister, Mrs. Ellen Tully, have testified to the strong resemblance between the two, not only in facial appearance, but in their movements, gestures, bearing and general physical traits. Amongst these witnesses are the eminent photographers, Messrs. Washburn and Lilienthal, whose profession entitles them to be considered as physiognomical experts.

7. It is established by undisputed evidence that both Bridget Cunningham and Kate Townsend had slight pock-marks, and Kate told McLearn that she had small-pox when quite young, which also corresponds with the facts as to Bridget. Such a coincidence might be the result of accident; but, as a clearly proved independent fact, it lends enormous weight to the other circumstances indicating identity.

8. There unquestionably did exist, at the time and before Kate's death, a well-authenticated rumor and impression that her true name was Bridget Cunningham.

This is established by the publication in the Police Gazette, before referred to, and is confirmed by the testimony of Mr. Aubertin, a witness of admitted respectability, and whose credibility is not assailed, that he had heard this rumor in New Orleans several years before Kate's death. Here we have another mysterious fact in the case which the State neither contests nor explains or accounts for in any manner.

9. The intervenors have introduced several witnesses who have testified that, at various times, in moments of confidence, Kate Townsend had told them the facts of her early history; that her name was Bridget Cunningham; that she was born in King's County, Ireland; the names of her mother, sister and brothers and other particulars fully identifying her with the missing Bridget. If these witnesses are to be believed no one would dispute that the case of intervenors is clearly established. Their testimony is fiercely assailed by counsel for the State. They were subjected to the utmost rigor of cross-examination. Some of them were ignorant washerwomen, dressmakers and hairdressers, who, under the fire of cross questions, fell into various inconsistencies not unusual with that class of witnesses. Others had characters not free from stain. I do not propose to discuss the details of this testimony, but content myself with the sentiment that so far as the substantial facts are concerned it is reasonable, probable and consistent, and I find no sufficient reason for disbelieving it. Indeed to regard this evidence as merely manufactured, without foundation in truth, would attribute to these witnesses a fertility of imagination and of ingenuity in circumstantial lying, which is absolutely incredible.

10. A significant fact which overshadows all the theories of the case is this: Unless Kate and Bridget were the same person, the known life of each is a fragment. Not a witness is found who ever saw or knew of the existence of Bridget, after her disappearance from New York about 1850. Not a witness is found who ever saw, or knew of the existence

Williams vs. Palace Car Company et al.

of Kate prior to that date. There is no reason to doubt that Bridget continued to live after her disappearance. It is certain that Kate did live prior to that event. It is not singular that knowledge of the existence of the one should cease before knowledge of the existence of the other began? The identity of the two blends these mysterious fragments into one consistent human life, and explains and reconciles every difficulty in this strange case. I shall not pursue the subject further. Each one of the foregoing circumstances is, by itself, a strand easily broken; but, combined, they seem to me to form a cord of strength amply sufficient to sustain the burden of proof required of intervenors.

I have given careful and candid consideration to all the objections urged by the State against the testimony in support of intervenors' claim, as well as the testimony adduced by the State herself. The latter is fairly considered in the majority opinion. I might consume many pages in discussing the objections, and showing why they are of no avail, in my opinion. But this would be useless. If the matter depended on my judgment alone I should favor a decree for intervenors. But I bear cheerful testimony to the faithful and herculean labor which has been expended in the study and analysis of this enormous record; and remindful of the imperative requirement imposed by the law on intervenors to establish their case with a certainty satisfactory to the judicial mind, I hesitate in holding that such requirement is discharged when they succeeded in satisfying the mind of only one out of the six judges who have considered the case. The decree being of non-suit only I shall not dissent.